1 | MITRA CHEGINI, Esq., SBN 203114
CALIFORNIA LAWYERS GROUP, INC.
2 | 440 E. La Habra Blvd.
La Habra, CA 90631
3 | Telephone no.:(562)690-1020
Facsimile no.: (562) 690-9092
4 |
5 | Attorney for Plaintiff
SILVIANO HERNANDEZ
6 |
7 |
8 |              UNITED STATES DISTRICT COURT
9 |        FOR THE CENTRAL DISTRICT OF CALIFORNIA
10 |

SILVIANO HERNANDEZ,,                    ) Case No.: SACV09-00011-CJC(MLGx)

                                        )
            Plaintiff,                   ) **FIRST AMENDED**
vs.                                     ) **VERIFIED COMPLAINT FOR:**
                                        ) 1. Violations of the truth in lending
EMC MORTGAGE                            ) act, 15 U.S.C. Sec.1601, et seq.;
CORPORATION; PACIFIC                    ) 2. Fraudulent omission;
MUTUAL FUNDING, INC., dba              ) 3. Quiet title action;
PACIFIC RESIDENTIAL                    ) 4. Rescission based on fraud;
FINANCING, A California                ) 5.  Rescission based on Violation of
Corporation; CAL-WESTERN               ) Section 1632 of Cal. Civ. Code;
RECONVEYANCE                           ) 6. Breach of Written Contract;
CORPORATION; and DOES 1 to            ) 7. Breach of the covenant of good
250, inclusive,                        ) faith and fair dealing; and
                                       ) 8. Injunctive relief
            Defendants.                 )

_____

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1

Plaintiff, Silviano Hernandez, alleges as follows:

## **INTRODUCTION**

1. This is an action pursuant to the Truth In Lending Act ("TILA"), 15 U.S.C. Section 1601, et seq., California's Unfair Competition Law ("UCL"), Bus. & Prof. Code Section 17200, et seq., and other statutory and common law in effect. Plaintiff Silviano Hernandez brings this action against Defendants EMC MORTGAGE CORPORATION (hereinafter "EMC"), PACIFIC MUTUAL FUNDING, INC., dba PACIFIC RESIDENTIAL FINANCING, A California Corporaiton (hereinafter "PACIFIC"), CAL-WESTERN RECONVEYANCE CORPORATION (hereinafter "CAL-WESTERN"), and Does 1 to 250 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiff in Defendants' Option Adjustable Rate Mortgage ("ARM") loan documents, and in the required disclosure statements, accompanying the loans, (i) the actual interest rate on the note (12 C.F.R. Section 226.17); (ii) that payments on the note at the teaser rate will result in negative amortization and that the principal balance will increase (12 C.F.R. Section 226.19);  (iii) that the initial interest rate provided was discounted and does not reflect the actual interest that Plaintiff would be paying on the note; and (iv) Plaintiff was not qualified to obtain the loan.  This action is also brought against EMC as the servicer of the loan held by Pacific, and CAL-WESTERN as the successor in interest of the rights of EMC for the limited purpose of conducting the non-judicial sale of Plaintiff's home, which is set for March 27, 2009.

## **PARTIES**

2. At all times mentioned herein, Plaintiff was and is an individual residing in the County of Orange, and the owner in possession of the subject real property

---

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1  located at 6099 East Camino Manzano, Anaheim, County of Orange, State of
2  California 92807(hereinafter "SUBJECT PROPERTY" or "Plaintiff's home"), and
3  legally described as LOT NUMBER: 159; TRACT: 7419; CITY/MUNI/TWNSP:
4  ANAHEIM; MAP: MP343 PG27-31, bearing APN number 358-161-16.
5       3.  At all times mentioned herein, defendant EMC, was and is a business
6  entity, and acting as a lender with its parent company registered in the State of
7  Texas, but permitted to conduct its mortgage lending business in the State of
8  California.  EMC is also the servicer of the loan originated by defendant PACIFIC.
9       4.  At all times mentioned herein, defendant PACIFIC, was a business
10 corporate entity and lender and finance company, authorized to conduct business
11 in the State of California as a mortgage lender.
12      5.  At all times mentioned herein, defendant CAL-WESTERN was and is a
13 business entity, form unknown, with its parent company in El Cajon, California.
14 At all times mentioned herein, defendant CAL-WESTERN was and is a trustee
15 company retained by EMC to conduct its non-judicial foreclosure proceedings
16 against Plaintiff's home.
17      6.  Plaintiff is ignorant of the true identity and capacity of Defendants
18 designated as DOES 1 to 250, but will amend the Complaint when their identities
19 have been ascertained according to proof at the time of trial.  Plaintiff alleges on
20 information and belief, however, that each and every doe defendant is in some
21 manner responsible for the acts, and conduct of other Defendants, and were, and
22 are, responsible for the injuries, damages, and harm, incurred by Plaintiff. Plaintiff
23 further alleges on information and belief that each such designated defendant
24 acted, and acts, as the authorized agent, representative, and associate of other
25 Defendants in doing the things alleged herein.
26      7. Plaintiff is informed, believes and thereon alleges, that at all times
27 relevant during the liability period, that Defendants, and each of them, including
28 ―――――――――――――――――――――――――――――――――――
**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

3

1   without limitation those Defendants herein sued as DOES, were acting in concert
2   or participation with each other, or were joint participants and collaborators in the
3   acts complaint of, and were the agents or employees of the others in doing the acts
4   complained of herein, each and all of them acting within the course and scope of
5   said agency and/or employment by the others, each and all of them acting in
6   concert with the other and all together.

7                              **VENUE AND JURISDICTION**

8       8.  Venue is proper in this Court, as the SUBJECT PROPERTY is located
9   within its Jurisdiction.

10                              **BACKGROUND FACTS**

11      9.  EMC and PACIFIC, collectively referred to as Defendants, sell, procure,
12  service, and facilitate a variety of home loans.  The Option ARM or adjustable rate
13  mortgage are the loans that are the subject of this Verified Complaint.  CAL-
14  WESTERN provides trustee and sale services for EMC.

15      10.  The instant action arises out of a residential mortgage refinance loan
16  transaction in which Defendant PACIFIC, failed to disclose pertinent information
17  in a clear and conspicuous manner to Plaintiff, in writing, as required by law, and
18  further failed to inform Plaintiff that he could not actually qualify for the loan
19  applied based on stated income only.

20      11.  Plaintiff alleges upon information and belief that Defendants are not the
21  holder of the original note identified in the Deed of Trust attached hereto as
22  Exhibit **A**.  Plaintiff further alleges that Defendants do not have the right to cause
23  the foreclosure and non-judicial sale of the SUBJECT PROPERTY owned by
24  Plaintiff, which non-judicial foreclosure is set for March 27, 2009.

25      12.  Plaintiff alleges that on or about November 20, 2008, demand by way of
26  letter was sent to EMC to produce proof that it possessed the original Note and
27  Deed of Trust on Plaintiff's home, and to date, EMC has not responded to the

28                  **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1 | demand.

2 |     13. This action also concerns Defendants' unlawful, fraudulent and unfair

3 | business acts or practices, as such acts relate to PACIFIC's unlawful lending

4 | practices as it will be more specifically alleged in the body of this Verified

5 | Complaint.

6 |     14. Plaintiff, along with thousands of other similarly situated consumers,

7 | was sold an option ARM home loan by PACIFIC. The option ARM loan sold to

8 | Plaintiff is a deceptively devised financial product. The loan has a variable rate

9 | feature with payment caps. The product sold to Plaintiff was sold based on the

10 | promise of a low fixed payment based on a low listed interest rate for a fixed

11 | period, which would then adjust to a much greater payment, and much greater

12 | interest rate than promised. Further, Defendants failed to disclose, and by

13 | omission, failed to inform Plaintiff of the fact that Defendants' option ARM loan

14 | was designed to cause negative amortization to occur. Further still, Plaintiff was

15 | approved for the option ARM loan without the benefit of verifiable income, assets,

16 | or of any proper qualifying procedures for the approval of a loan for an individual

17 | who was self-employed. Defendants extended the loan to Plaintiff, knowing that

18 | he would not and could not qualify for it, and approved the same without requiring

19 | rigorous proof of his ability to pay back the loan. Once lured into the loan,

20 | Plaintiff could not easily extricate himself from the loan because Defendants

21 | included in the loan a stiff and onerous prepayment penalty making it extremely

22 | difficult, if not impossible, for Plaintiff to extricate himself from the loan.

23 |     15. On or about December 7, 2006, Plaintiff entered into a written

24 | agreement with PACIFIC for the refinancing of Plaintiff's loan on Plaintiff's

25 | home. The loan was not used to purchase the Subject Property, and as suhc it was

26 | not secured by the property, but by the equity in the property. Plaintiff applied for

27 | a loan in the sum of $600,000.00, with the following terms and conditions: i) An

28 | **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1    initial interest rate of 7.250% for the first 51 months, with a possibility of a change

2    in the interest rate not to exceed 12.250%, and the interest rate would not be

3    increased or decreased by more than 1.00% on any single change date, and the

4    interest rate would not be less than 2.250%; ii) Prepayment penalty would apply if

5    Plaintiff paid more than 20% of the principal balance of the note within the first

6    three years of the anniversary date of the Note; and iii) The initial payment was to

7    be $2,125.00 per month, as an interest only payment.  A copy of the Adjustable

8    Rate Note which is the Contract is attached hereto as Exhibit **B**.

9        16.  On or about February 1, 2007, the transaction was consummated when

10    Plaintiff made the first mortgage payment.  Plaintiff continued to make the

11    payments until a combination of Plaintiff's lack of income and the prohibitive

12    interest rate change, caused Plaintiff to default on the loan on or about June 23,

13    2008, and a Notice of Default was issued by EMC (Exhibit **C**).  A Notice of

14    Trustee's Sale was allegedly issued by EMC with CAL-WESTERN as the Trustee

15    at some point after June 23, 2008, although Plaintiff has never received any notices

16    of sale.  The initial sale date was purportedly set for December 10, 2008.  It is

17    currently set for March 27, 2009.

18        17.  Plaintiff alleges that as a consumer who applied for a refinance

19    mortgage loan through defendants, defendants intended Plaintiff to believe during

20    the loan application process that Plaintiff would qualify for the loan, and that in

21    entering into the loan Plaintiff would have a an interest only payment for the first

22    51 months of the loan, with an adjustment thereto, after the expiration of the 51

23    month period.  Defendants initiated this scheme in order to maximize the amount

24    of the loan they sold to Plaintiff and to maximize their respective profits.  Plaintiff

25    further alleges that this was a high cost loan.

26    //

27    //

28

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

# FIRST CAUSE OF ACTION

## VIOLATIONS OF THE TRUTH IN LENDING ACT

### 15 U.S.C. SECTION 1601, et seq.

### AGAINST DEFENDANTS PACIFIC, and DOES 1 TO 25, INCLUSIVE

18. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 17 of the First Amended Verified Complaint (FAVC) as though herein fully set forth.

19. Plaintiff alleges that 15 U.S.C. Section 1601, et seq., is the Federal Truth in Lending Act ("TILA"). The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. Section 226) and its Official Staff Commentary. Compliance by lenders with Regulation Z became mandatory October 1, 1982. Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

20. The purpose of TILA is to protect consumers. This is stated in 12 C.F.R. Section 226.1, which reads: "*The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling.*"

21. Reg. Z also mandates very specific disclosure requirements regarding home loans which lenders, including defendant PACIFIC must comply: "*Section 226.17. General disclosure requirements. (a) Form of disclosures. (1) The Creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under Section 226.18.*"

---

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

7

22.  The purpose of TILA is to assure a meaningful disclosure of credit terms so that the borrower will be able to compare readily the various credit terms available to him and avoid the uninformed use of credit to protect the consumer against unfair credit billing practices.

23.  Plaintiff alleges that defendant PACIFIC's option ARM loan violates TILA because PACIFIC failed to comply with disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board.  PACIFIC failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiff as PACIFIC was required to do under TILA.

24.  The TILA violations committed by PACIFIC are more specifically detailed as follows:

a.  12 C.F.R. Section 226.17 and 12 C.F.R. Section 226.19 require the lender to make disclosures concerning the interest rate in a clear and conspicuous manner. Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.  PACIFIC failed to meet the disclosure mandates required of it concerning the interest rate PACIFIC actually applied to Plaintiff's loan, as well as the interest PACIFIC actually charged Plaintiff.

b.  PACIFIC's disclosure in the Note concerning the interest rate is at best unclear and inconspicuous as several other rates are also indicated.  At worst, it is intentionally deceptive.  In either instance, it is certainly different than the interest rate set forth by PACIFIC in the Truth In Lending Documents (TILD) which sets the interest rate at 7.678%, and the starting interest rate is 7.250%.

c.  The convoluted language used by PACIFIC to disclose the interest rate on Plaintiff's loan is not clear and conspicuous in the following manner:  at paragraph 1 of the Note, the interest rate is set at 7.250%.  Yet, at paragraph 4(D)

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1    the interest rate is disclosed as 12.250% or 2.250%, with an indication that the

2    interest rate change will never be increased or decreased by more than 1.000%.

3    The disclosure regarding the applicable interest rate is unclear and meant to

4    mislead and deceive Plaintiff.  Furthermore, the Note at paragraph 3(b) states that

5    the initial payments of $2,125.00 are interest payments.  This is also false, because

6    the interest only payment for the first year would actually be $3,625.00 per month.

7    Plaintiff's initial payments for the first 51 months of the loan would, and did, cause

8    negative amortization, with no part of the payments applied to reduce either the

9    interest or principal balance of the loan.  In fact, over the first 51 months of the

10   loan the sum of $76,500.00 is added to the principal balance of the loan, with a

11   proportional loss in equity of Plaintiff's home; and

12          d.  Although the Note at page indicates that the loan is a variable rate loan

13   and in parenthesis it refers to one of the features of the loan as "negative

14   amortization", the language of the paragraph is couched in permissive rather than

15   mandatory language, using terms such as *"may"*, which misleads the borrower, in

16   that the adjustment was not a possibility but an actuality, contrary to the language

17   of the Note.  Furthermore, there is no explanation and disclosure in the Note or any

18   of the TILDs as to the consequence of a negatively amortized loan, such as the fact

19   that negative amortization causes depletion of the equity, and thus it robs Plaintiff

20   of the benefit of the loan, and the value of the property which is the reason most

21   consumers refinance their existing loans.

22          25.  Plaintiff alleges that at all times mentioned herein, PACIFIC failed to

23   clearly, conspicuously, and accurately disclose the actual interest rate applied to

24   Plaintiff's loan, and failed to disclose that the payment amounts for the first 51

25   months of the loan would be insufficient to pay the loan within the specified 30

26   year term, based on the negative amortized loan, and the fiscal consequences of a

27   **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1    negatively amortized loan. The disclosures must inform the borrower what the true

2    cost of the loan is.

3         26.  The disclosures required pursuant to C.F.R. Section 226.19 are

4    extremely important because Plaintiff needs this information in order to budget his

5    money.  Plaintiff needs to know if the house payments are going to go up so that

6    Plaintiff can plan for it.

7         27.  Plaintiff alleges that the informed use of credit means being able to

8    make decisions, as well as being able to plan an individual's finances.  Every

9    month consumers look at their income and budget where the funds must be paid.

10   The biggest investment in one's life is generally the person's home.  In fact, it is

11   often referred to as "the American Dream" to own a home.

12        28.  Plaintiff alleges that a variable rate loan is based on a margin and an

13   index.  The index is often the Prime Rate or LIBOR exchange rate.  The margin is

14   the amount the lender charges over that rate, which is the lender's profit on the

15   loan.

16        29.  TILA and Regulation Z require disclosures to be clear and conspicuous

17   so people understand what their obligations are.  In particular, when the payment is

18   not based on that index and margin a separate disclosure is required.  The

19   disclosure must also inform that interest rate and payment may go up and clearly

20   and conspicuously provide the circumstances under which the rate and payment

21   will increase.  Further, the disclosure must inform the borrower what the true cost

22   of the loan is.

23        30.  The Federal Reserve Board established disclosure requirements for

24   variable rate loans. 26 C.F.R. Section 226.19 requires a lender to disclose the

25   frequency of interest rate and payment adjustments to borrowers.  If interest rate

26   changes will be imposed more frequently or at different intervals than payment

27

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1    changes, a creditor must disclose the frequency and timing of both types of

2    changes.

3         31. The disclosures required pursuant to 12 C.F.R. Section 226.19 are

4    extremely important because Plaintiff needs this information in order to budget his

5    money. Plaintiff needs to know of the house payments are going to go up so that

6    Plaintiff can plan for it. If the change comes as a surprise, Plaintiff faces a much

7    greater possibility of defaulting on the loan and losing her home.

8         32. Plaintiff alleges that here, PACIFIC states only that the interest rate may

9    increase in the future. However, an interest rate increase was in fact more certain

10   than this disclosure led Plaintiff to believe. PACIFIC gave the starter low interest

11   rate to Plaintiff for 51 months, and the interest rate was guaranteed to go up even

12   without any change in the index. Thus, the increase in the interest rate on the loan

13   was not just a possibility, but it was an absolute certainty and PACIFIC failed and

14   omitted this material information in its disclosure to Plaintiff.

15        33. PACIFIC's loan documents state that the interest rate may increase

16   during the term of this transaction if the index increases. This, however, was not

17   the only circumstance that could cause an increase in the interest rate because the

18   disclosed interest rate was discounted.

19        34. Plaintiff alleges that PACIFIC failed to disclose to Plaintiff that the

20   interest rate was with 100% certainty going to increase, regardless of whether or

21   not the index upon which the loan is based changed. As such, PACIFIC violated

22   TILA and Regulation Z by providing Plaintiff with unclear, deceptive and poorly

23   drafted or intentionally misleading disclosures.

24        35. Plaintiff alleges that PACIFIC provided Plaintiff with multiple,

25   conflicting interest rates when describing the costs of the loan. On the TILDS

26   PACIFIC sets forth one interest rate, while on the Note, PACIFIC sets forth one or

27   **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1  two other interest rates.

2   36. The Official staff commentary to 226 C.F.R. Section 17(c)(8) states:

3  "*Basis of disclosures in variable rate transactions. The disclosures for a*

4  *variable rate transaction must be given for the full term of the transaction*

5  *and must be based on the terms in effect at the time of consummation.*

6  *Creditors should base the disclosures only on the initial rate and should not*

7  *assume that this rate will increase. For example, in a loan with an initial*

8  *rate of 10 percent and a 5 percent points rate cap, creditors should base the*

9  *disclosures on the initial rate and should not assume that this rate will*

10  *increase 5 percentage points. However, in a variable rate transaction with*

11  *a seller buydown that is reflected in the credit contract, a consumer*

12  *buydown, or a discounted or premium rate, disclosures should not be based*

13  *solely on the initial terms. In those transactions, the disclosed annual*

14  *percentage rate should be a composite rate based on the rate in effect*

15  *during the initial period and the rate that is the basis of the variable rate*

16  *feature for the remainder of the term.*

17   37. The reason for this requirement is clear. Consumers such as Plaintiff

18  cannot make informed decisions when they cannot compare the costs of credit to

19  other proposals. It is therefore incumbent upon PACIFIC to show the composite

20  interest rate in effect so that the borrower (i.e. Plaintiff) can understand exactly

21  what Plaintiff will be paying for the loan.

22   38. A lender violates TILA, Reg. Z and the OTS guidelines by failing to list

23  the composite rate in variable rate loans that have a discounted initial rate. The

24  loan sold to Plaintiff by PACIFIC is a variable rate loan. At all times relevant

25  during the liability period, PACIFIC listed an interest rate in the Note that in truth

26  did not coincide withe interest rate quoted within the TILDs. Because PACIFIC

27  **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1   failed to clearly and conspicuously identify which of the many interest rates

2   indicated by it is the composite interest rate, instead listing different rates in

3   different places in the documents provided Plaintiff, PACIFIC violated TILA and

4   Regulation Z, and failed to provide disclosures that did not obscure relevant

5   information, and further failed to provide an explanation as to the consequence of

6   a negatively amortized loan on the equity of the property.  PACIFIC also violated

7   the following provisions of 15 U.S.C. Sections 1639: Subparagraph (f): No

8   negative amortization; (c) No prepayment penalty; and (h) Prohibition on

9   extending credit without regard to payment ability of consumer.  Plaintiff was

10   given a negative amortized loan based upon the starting interest rate of 7.250%

11   and the subsequent payments over the first 51 months of the life of the loan, which

12   would and did increase the principal balance of the loan, increased the interest

13   balance, and reduced the subject property's equity.   The prepayment penalty

14   provision of the loan originated by  PACIFIC provides for a prepayment penalty

15   within the first three years of the loan, whereas subparagraph (c) prohibits such a

16   provision.  Finally, Plaintiff's ability to repay the refinanced loan was not verified

17   by PACIFIC as required per subparagraph (h) of Section 1639, considering that

18   this was, and is, a high fee loan.

19       39.  Plaintiff alleges that he did not discover these violations and fraud

20   perpetrated upon him until June 23, 2008, when he first received the Notice of

21   Default from CAL-WESTERN as the assigned Trustee by EMC.  As a direct and

22   proximate result of PACIFIC violations of TILA as alleged herein, Plaintiff has

23   suffered injury in an amount to be determined at time of trial.  More specifically,

24   Plaintiff has lost several tens and thousands, if not hundreds of thousands of

25   dollars in the equity of his home based upon the negative amortized option ARM

26   loan that PACIFIC sold Plaintiff.  Had PACIFIC not violated TILA and had

27

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1  instead clearly and conspicuously disclosed the material terms of the option ARM

2  loan, Plaintiff would not have entered into the home loan contract with PACIFIC.

3  Because PACIFIC failed to make the proper disclosures required under TILA,

4  Plaintiff now seeks redress in an amount and/or type as proven at time of trial.

## SECOND CAUSE OF ACTION

## FRAUDULENT OMISSION

## AGAINST DEFENDANTS PACIFIC AND DOES 51 TO 75, INCLUSIVE

8      40.  Plaintiff realleges and incorporates by reference the allegations

9  contained in paragraphs 1 to 39 of the FAVC as though herein fully set forth.

10      41.  Plaintiff alleges that during the loan application process, defendants

11  failed to inform Plaintiff that based solely on his stated income, his credit rating,

12  and the ratio of his assets and liabilities, Plaintiff could not and would not qualify

13  for the subject option ARM loan.  Plaintiff further alleges that PACIFIC failed to

14  inform Plaintiff that the application of a negatively amortized loan would deplete

15  the equity in Plaintiff's property at the rate of $3,166.67 per month for the first 51

16  months of the loan, thus divesting Plaintiff of any benefit the refinanced loan was

17  designed and meant to pass on to Plaintiff.  Plaintiff further alleges that PACIFIC

18  also failed to inform Plaintiff that including a prepayment penalty clause as part of

19  the loan was in violation of 15 U.S.C. Section 1639(f), in consideration of the fact

20  that Plaintiff was getting a high fee loan.

21      42.  Plaintiff alleges that from and after February 1, 2007, and thereafter,

22  PACIFIC, had a duty to disclose, when it knew the falsity of the representations

23  and lack thereof, to Plaintiff that: a) he could not qualify for the subject loan; b)

24  PACIFIC could not insert and enforce a prepayment penalty provisions; and c) the

25  starting interest rate would, and did, cause negative amortization, which was and is

26  illegal by PACIFIC to impose upon Plaintiff.  Plaintiff alleges that PACIFIC chose

27

28

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1  not to disclose this information to benefit from the payments Plaintiff would make,

2  and did make, on the loan, and would eventually foreclose on the SUBJECT

3  PROPERTY, when Plaintiff would, and has as of present, defaulted on the loan,

4  and the non-judicial foreclosure sale is set for March 27, 2009.

5        43. Plaintiff alleges that at all times relevant, PACIFIC failed to disclose

6  and/or concealed material facts by making partial representations of some material

7  facts such as representing to Plaintiff that his stated income would be sufficient to

8  qualify him for the option ARM loan, when PACIFIC had exclusive knowledge of

9  material facts, namely that Plaintiff could not have qualified for a loan in the

10  amount of $100,000.00, let alone $600,000.00, with monthly payments that would,

11  and did, outstrip Plaintiff's financial ability to generate revenue.  Moreover,

12  because PACIFIC did not inform Plaintiff that a prepayment penalty was not

13  necessary, and that the loan would cause negative amortization, which would, and

14  has, drained the equity of Plaintiff's home, and at the same time increasing the

15  principal and interest balances of the loan, Plaintiff is now in a position where he

16  has lost several hundreds of thousands of dollars in equity, and is faced with the

17  prospect of losing his home on March 27, 2009, to a non-judicial foreclosure sale.

18        44. Plaintiff alleges that he justifiably relied upon the expertise, experience,

19  and knowledge of PACIFIC to be encumbered by the subject option ARM loan.

20  Plaintiff's reliance was justifiable based upon defendants' knowledge of the

21  mortgage lending and real estate industries, and based upon Plaintiff's lack of

22  understanding of the same industries, despite the fact that Plaintiff had previously

23  refinanced the loan on the SUBJECT PROPERTY.  Plaintiff alleges that he did not

24  discover the falsity of the representations made by PACIFIC until after June 23,

25  2008, when he was served with a Notice of Default of the loan.

26  //

27        **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1    45.  Plaintiff alleges that had he known the true facts, he would have

2    considered other options, and would not have obligated himself to a $600,000.00

3    option ARM negatively amortized loan, but would have considered other types of

4    loans that would not punish Plaintiff for attempting to restructure his original loan.

5    46.  Plaintiff alleges that as a direct and proximate result of defendants'

6    failure to disclose and omission of the above-mentioned material facts, as alleged

7    herein, Plaintiff has suffered compensatory and equitable damages, in a sum

8    according to proof at trial.

9    47.  Plaintiff alleges that the wrongful conduct of defendants, as alleged

10   herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially

11   injurious, malicious and in conscious disregard for the well being of Plaintiff.

12   Accordingly, Plaintiff seeks punitive and exemplary damages against defendants in

13   an amount to deter defendants from similar conduct in the future.

14                          **THIRD CAUSE OF ACTION**

15                            **FOR QUIET TITLE**

16   **AGAINST PACIFIC, CALWESTERN AND DOES 76 TO 100, INCLUSIVE**

17   48.  Plaintiff realleges and incorporates by reference the allegations of

18   paragraphs 1 to 47 of the FAVC, as though herein fully set forth.

19   49.  Plaintiff is the owner of the SUBJECT PROPERTY per the Deed of

20   Trust executed by Plaintiff, and as evidenced at Exhibit **A**.

21   50.  The basis of Plaintiff's interest in title is a deed of Trust from

22   Defendants, granting the SUBJECT PROPERTY to plaintiff, and recorded in the

23   Official Records of the County of Orange.

24   51.  Plaintiff is seeking to quiet title against the claims of Defendants as

25   follows: Defendants are seeking to hold themselves out as the fee simple owners of

26   the subject properties, when in fact Plaintiff has an interest in such properties held

27   ──────────────────────────────────────────────

     **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1  by defendants, when defendants have no right, title, interest, or estate in the

2  SUBJECT PROPERTY, and Plaintiff's interest is adverse to defendants' claims of

3  ownership.  Plaintiff further alleges that as a direct and proximate result of

4  PACIFIC's unlawful conduct regarding the subject loan, PACIFIC has waived any

5  right to force Plaintiff to tender the full indebtedness of the loan, or any portion

6  thereof, as PACIFIC's conduct has by operation of law prevented Plaintiff from

7  tendering the balance of the loan or any indebtedness thereof.

8        52. Plaintiff seeks to quiet title as of 11/23/08.

9        53.  Plaintiff therefore seeks a judicial declaration that the title to the

10  SUBJECT PROPERTY is vested in Plaintiff alone and that defendants PACIFIC

11  and its successor trustee CAL-WESTERN be declared to have no estate, right,

12  title, or interest in the SUBJECT PROPERTY and that said defendants, and each

13  of them, be forever enjoined from asserting any estate, right, title, or interest in the

14  SUBJECT PROPERTY, adverse to Plaintiff herein.

15                    **FOURTH CAUSE OF ACTION**

16        **FOR RESCISSION BASED ON FRAUD (NON-DISCLOSURE)**

17   **AGAINST DEFENDANTS PACIFIC AND DOES 101 TO 125, INCLUSIVE**

18        54.  Plaintiff realleges and incorporates by reference the allegations of

19  paragraphs 1 to 53 of the FAVC, as though herein fully set forth.

20        55.  Plaintiff alleges that during the loan application process, defendants

21  failed to inform Plaintiff that based solely on his stated income, his credit rating,

22  and the ratio of his assets and liabilities, Plaintiff could not and would not qualify

23  for the subject option ARM loan.  Plaintiff further alleges that PACIFIC failed to

24  inform Plaintiff that the applicable starting interest rate would cause depletion of

25  the equity in the property, thus divesting Plaintiff of any benefit that the

26  refinancing of his original loan would provide Plaintiff.  Plaintiff further alleges

27

28

---

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1   that PACIFIC also failed to inform Plaintiff that including a prepayment penalty

2   clause as part of the loan was in violation of 15 U.S.C. Section 1639(c), in

3   consideration of the fact that Plaintiff was getting a high fee loan.

4       56.  Plaintiff alleges that from and after February 1, 2007, and thereafter,

5   PACIFIC had a duty to disclose, when it knew the falsity of the representations

6   and lack thereof, to Plaintiff that: a) he could not qualify for the subject loan; b)

7   they could not insert and enforce a prepayment penalty provisions; and c) the

8   starting interest rate would, and did, cause negative amortization, which was and is

9   illegal by these defendants to impose upon Plaintiff.  Plaintiff alleges that

10  PACIFIC chose not to disclose this information to benefit from the payments

11  Plaintiff would make, and did make, on the loan, and would eventually foreclose

12  on the SUBJECT PROPERTY, when Plaintiff would, and has as of present,

13  defaulted on the loan, and the non-judicial foreclosure sale is set for March 27,

14  2009.

15      57.  Plaintiff alleges that at all times relevant, PACIFIC failed to disclose

16  and/or concealed material facts by making partial representations of some material

17  facts such as representing to Plaintiff that his stated income would be sufficient to

18  qualify him for the option ARM loan, when these defendants had exclusive

19  knowledge of material facts, namely that Plaintiff could not have qualified for a

20  loan in the amount of $100,000.00, let alone $600,000.00, with monthly payments

21  that would, and did, outstrip Plaintiff's financial ability to generate revenue.

22  Moreover, because PACIFIC did not inform Plaintiff that a prepayment penalty

23  was not necessary, and that a negatively amortized loan would, and has, drained

24  the equity of Plaintiff's home, and at the same time increasing the principal and

25  interest balances of the loan, Plaintiff is now in a position where he has lost several

26  hundreds of thousands of dollars in equity, and is faced with the prospect of losing

27      **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

1    his home on March 27, 2009, to a non-judicial foreclosure sale.

2       58.  Plaintiff alleges that he justifiably relied upon the expertise, experience,

3    and knowledge of PACIFIC  to be encumbered by the subject option ARM loan.

4    Plaintiff's reliance was justifiable based upon defendants' knowledge of the

5    mortgage lending and real estate industries, and based upon Plaintiff's lack of

6    understanding of the same industries, despite the fact that Plaintiff had previously

7    refinanced the loan on the SUBJECT PROPERTY.  Plaintiff alleges that he did not

8    discover the falsity of the representations made by PACIFIC until after June 23,

9    2008, when he was served with a Notice of Default of the loan.

10      59.  Plaintiff alleges that had he known the true facts, he would have

11    considered other options, and would not have obligated himself to a $600,000.00

12    loan which would and has rendered the equity in his property null and void, and is

13    in fact in the negative, as the present market value of the property is approximately

14    $200,000.00 below the value of the loan's principal balance.

15      60.  Plaintiff alleges that as a direct and proximate result of defendants'

16    failure to disclose and omission of the above-mentioned material facts, as alleged

17    herein, Plaintiff has suffered compensatory and equitable damages, in a sum

18    according to proof at trial.

19      61.  Plaintiff alleges that the wrongful conduct of defendants, as alleged

20    herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially

21    injurious, malicious and in conscious disregard for the well being of Plaintiff.

22    Accordingly, Plaintiff seeks punitive and exemplary damages against defendants in

23    an amount to deter defendants from similar conduct.

24    //

25    //

26    //

27

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

# FIFTH CAUSE OF ACTION

## FOR

## RESCISSION BASED ON VIOLATION OF SECTION 1632 OF THE CIVIL CODE AGAINST DEFENDANTS PACIFIC AND DOES 126 to 150, inclusive

62.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 to 61 of the FAVC, as though herein fully set forth.

63.  Plaintiff alleges that pursuant to **Section 1632(b)(4)** of the California Civil Code, any person engaged in a trade or business who negotiates primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean, in the course of entering into any contract or agreement, a loan or extension of credit secured by property, or entering into a consumer lending transaction, must include a translation of every term and condition in that contract or agreement.

63.  Plaintiff alleges that Spanish is his primary language, with which he transacts business, and interacts daily with other Spanish speaking persons. Plaintiff further alleges that the entire subject loan transaction was undertaken in Spanish, and that Plaintiff requested a Spanish language version of the loan documents but was not provided with the translation of the loan documents at any time during or after the loan refinance transaction.

64.  Plaintiff alleges that from and after February of 2007, and thereafter, PACIFIC did not disclose to Plaintiff that it had a statutory duty to provide Plaintiff with a Spanish translation of the loan documents, and of the notice of Default and sale of the SUBJECT PROPERTY by way of non-judicial foreclosure.

65.  Plaintiff alleges that in the absence of any Spanish to English translation of the terms of the original loan, Plaintiff relied upon defendants' knowledge, expertise, and good faith to protect Plaintiff's interests through the loan.

//

---

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

66.  Plaintiff alleges that PACIFIC in derogation and intentional disregard of its statutory duty to provide Plaintiff with a Spanish language translation of the terms of the loan, proceeded with the making of the loan, and the subsequent purchase of the note, respectively, with English language terms, and closed the transaction on or about February 1, 2007.

67.  Plaintiff alleges that the true facts were that PACIFIC was, and is, obligated to provide Plaintiff with a Spanish language translation of the loan documents, and the terms and conditions therein, as required by **Section 1632 of the Cal. Civil Code**.  In the absence of such disclosure, Plaintiff justifiably relied upon defendants to complete the loan transfer transaction.  Had PACIFIC disclosed its statutory duty to Plaintiff, Plaintiff would have demanded a Spanish translation of the loan documents before signing the loan documents.  This is specially so, since the loan Plaintiff entered into was not a purchase money loan, but a non-purchase money loan covered pursuant to **Section 1632(b)(4) of Cal. Civil Code.**

68.  Plaintiff alleges that the fraudulent conduct of PACIFIC has caused Plaintiff to incur costs and expenses in addition to the prospect of losing the SUBJECT PROPERTY to a trustee's sale which is scheduled for March 27, 2009.

69.  Plaintiff alleges that based upon the fraud perpetrated upon him by PACIFIC, the Deed of Trust and the transfer of the loan from and after February 1, 2007, must be rescinded.

//
//
//
//
//

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

## SIXTH CAUSE OF ACTION

## FOR BREACH OF WRITTEN CONTRACT

## AGAINST DEFENDANTS PACIFIC AND DOES 151 TO 200, INCLUSIVE

70. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 69 of the FAVC as though herein fully set forth.

71. Plaintiff alleges that on or about December 7, 2006, Plaintiff entered into a refinance loan agreement with PACIFIC, which was and is a written contract, for the refinance of the original loan on the SUBJECT PROPERTY. The essential terms of the Contract are memorialized at Exhibit **B**.

72. Plaintiff alleges that The Note at paragraph 3(B) stated that the payment of $2,125.00 would be applied to interest, in effecting making it an interest only payment for the first 51 months of the loan. Furthermore, the Note at paragraph 3(A) also stated that payments would be applied to interest first before being applied to principal.

73. Plaintiff alleges that he performed every condition, promise, and covenant required of him under the Note, with the exception of such conditions, promises, and covenants that were and are excused by PACIFIC's breach of the terms of the Note.

74. Plaintiff alleges that from and after June 23, 2008, PACIFIC breached the Note (contract) when Plaintiff discovered that the payments he had been making for 16 months was actually not an interest only payment, but a negative amortized payment with the mortgage payments not being applied to reduce the interest balance of the loan as expressly represented at paragraphs 3(A) and (B) of the Note. The express terms at paragraph 3(A) and (B) of the Note were and are in contravention to the terms of the Option ARM loan, and as such Plaintiff alleges were and are ab initio void.

---

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1    75. Plaintiff alleges that as a consequence of the breach of the Contract by

2  PACIFIC, Plaintiff has incurred compensatory damages in a sum not less than

3  $160,000.00, and is in imminent danger of losing the SUBJECT PROPERTY by

4  way of non-judicial foreclosure on March 27, 2009.

5                    **SEVENTH CAUSE OF ACTION**

6              **FOR BREACH OF THE IMPLIED COVENANT OF**

7                 **GOOD FAITH AND FAIR DEALING**

8    **AGAINST DEFENDANTS PACIFIC AND DOES 201 TO 250, INCLUSIVE**

9    76. Plaintiff realleges and incorporates by reference the allegations

10  contained in paragraphs 1 to 75 of the FAVC as though herein fully set forth.

11   77. Plaintiff alleges that implied in every contract there exists a covenant

12  that parties to an agreement will deal fairly and at arms length with one another,

13  and will deal in good faith to accomplish the objectives of the agreement.

14   78. Plaintiff alleges that on or about June 23, 2008, and thereafter,

15  PACIFIC breached the implied covenant of good faith and fair dealing when it

16  used its superior knowledge in the real estate, lending, and finance industries to

17  intentionally hide the fact that PACIFIC was obligated to comply with the

18  mandatory disclosure requirements of TILA, that Plaintiff could not qualify for the

19  option ARM loan for which Plaintiff applied, and the loan would in fact cost

20  Plaintiff significantly more than what was stated by the TILDs as the loan was

21  based on negative amortization, which increased the loan's interest and principal

22  balances whilst draining the property's equity.

23   79. Plaintiff alleges that as a result of PACIFIC's breach of the implied

24  covenant of good faith and fair dealing, Plaintiff is in imminent danger of losing

25  the SUBJECT PROPERTY to non-judicial foreclosure, and has been damaged in a

26  sum not less than $160,000.00.

27  ———————————————————————————

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

## EIGHTH CAUSE OF ACTION

## FOR INJUNCTIVE RELIEF

## AGAINST ALL DEFENDANTS

80. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 to 79 of the FAVC as though herein fully set forth.

81. Plaintiff alleges that defendants' actions have undermined his right to the SUBJECT PROPERTY and have interfered, and continue to interfere with Plaintiff's right of possession as the owner of the SUBJECT PROPERTY.

82. By the actions above and set forth herein, Plaintiff has a strong likelihood of prevailing on the merits of the case. Plaintiff requests that this Court grant a preliminary Injunction and Temporary restraining order and injunctive relief under **CCP Section 527** and **Cal. Rules of Court Section 3.1150**, first as to any action to set the SUBJECT PROPERTY for a non-judicial sale pursuant to foreclosure proceedings, and secondly a permanent injunction precluding defendants from engaging in the wrongful conduct identified herein in the future.

**WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS, AND EACH OF THEM AS FOLLOWS:**

1. That the foreclosure or attempted foreclosure of Plaintiff's home be deemed illegal and void and the same be permanently enjoined;

2. That the December 7, 2006, Loan refinance transaction be deemed void as a result of defendants' various fiduciary breaches and TILA violations;

3. That the actions of all of the defendants be determined to be unfair and deceptive business practices in Violation of California law, TILA, Regulation Z, and that this Court award all such relief to Plaintiff as Plaintiff may be entitled, including treble damages and an award of costs and attorney's fees;

4. That the actions of defendants be determined to be in violation of TILA,

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1   Regulation Z, including but not limited to **Section 1632 of California Civil Code**,

2   which violations cause the rescission of the December 7, 2006, refinance loan

3   contract, and disgorgement of any and all payments made by Plaintiff to

4   defendants;

5   5.  A permanent injunction precluding defendants, and each of them, from

6   engaging in the wrongful conduct identified herein;

7   6.  For compensatory damages against defendants not less than $160,000.00;

8   7.  For punitive and exemplary damages against defendants in a sum according to

9   proof at trial;

10  8.  For award of attorney's fees, and reasonable costs of suit incurred; and

11  9.  For any other relief the Court may deem just and proper.

12

13  Date: 03/17/09                          **CALIFORNIA LAWYERS GROUP, INC.**

14

15

16                                 By: _____

17                                          Mitra Chegini,
                                            Attorney for Plaintiff
18  //                                      SILVIANO HERNANDEZ

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  _____
    **FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

28

## **VERIFICATION**

I, Silviano Hernandez, for myself, acknowledge that I am the Plaintiff in the above-entitled action. I have read the above First Amended Verified Complaint for Damages, and know the contents thereof. The same is true of my knowledge, except as to those matters that are therein stated on information and belief, concerning those matters, I believe them to be true. This document was translated in Spanish for me.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct as executed this 16th day of March, 2009, in the City of La Habra, Country of Orange.

By: _____
Silviano Hernandez
Plaintiff

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES**

# EXHIBIT A

Recording Requested By:
PACIFIC MUTUAL FUNDING, INC.
DBA PACIFIC RESIDENTIAL
FINANCING

And After Recording Return To:
PACIFIC MUTUAL FUNDING, INC.
DBA PACIFIC RESIDENTIAL
FINANCING
3020 SATURN STREET, SUITE 100
BREA, CALIFORNIA 92821
Loan Number: 6110215

——————————————— [Space Above This Line For Recording Data] ———————————————

# DEED OF TRUST

**MIN:** 1002729-0000005190-4

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   DECEMBER 7, 2006      , together with all Riders to this document.
(B) "Borrower" is   SILVIANO HERNANDEZ, A SINGLE MAN

Borrower is the trustor under this Security Instrument.
(C) "Lender" is   PACIFIC MUTUAL FUNDING, INC. DBA PACIFIC RESIDENTIAL
FINANCING
Lender is a   CALIFORNIA CORPORATION                                           organized
and existing under the laws of   CALIFORNIA
Lender's address is   3020 SATURN STREET, SUITE 100, BREA, CALIFORNIA
92821

(D) "Trustee" is   TICOR TITLE COMPANY, A CALIFORNIA CORPORATION
1440 N. HARBOR BLVD., SUITE 108, FULLERTON, CALIFORNIA 92835

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated   DECEMBER 7, 2006
The Note states that Borrower owes Lender   SIX HUNDRED THOUSAND AND 00/100
                                    Dollars (U.S. $  600,000.00     ) plus interest.

———————————————————————————————————————————————————————————————
CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          *DocMagic* *EForms* 800-649-1362
Form 3005 01/01                                    Page 1 of 14                              www.docmagic.com

*EXHIBIT A*
*-27-*

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2037 .

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Planned Unit Development Rider
☐ Balloon Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Second Home Rider
☐ Condominium Rider    ☒ Other(s) [specify]
                                     PREPAYMENT RIDER

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "Escrow Items" means those items that are described in Section 3.

(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                     Page 2 of 14                     DocMagic *EForms* 800-649-1362
                                                www.docmagic.com

28

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of ORANGE :
[Type of Recording Jurisdiction]                      [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 358-161-16

which currently has the address of 6099 EAST CAMINO MANZANO
                                                    [Street]

ANAHEIM                      , California    92807      ("Property Address"):
[City]                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

~ 29 ~

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

-30-

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic* €₱₳₮₥₥₴ 800-649-1362
Form 3005 01/01                                    Page 7 of 14                                    www.docmagic.com

—33—

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                   Page 8 of 14                                   DocMagic €Ϝⲟⲣⲙⲃ 800-649-1362
                                                                                                 www.docmagic.com

— 34 —

or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  **Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"):  (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  **Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  **Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                                    Page 9 of 14                                    *DocMagic* *CForms* 800-649-1362
www.docmagic.com

—35—

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action

required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
SILVIANO HERNANDEZ         -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

Witness:                                   Witness:

_____                  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic *eFormss* 800-649-1362
Form 3005 01/01                    Page 13 of 14                                      www.docmagic.com

—39—

State of California )
) ss.
County of ORANGE )

On                              before me,

personally appeared   SILVIANO HERNANDEZ

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY SIGNATURE _____

_____
(Typed Name of Notary)

NOTARY SEAL

_40 _

Loan Number:  6110215

Date:  DECEMBER 7, 2006

Property Address:  6099 EAST CAMINO MANZANO, ANAHEIM, CALIFORNIA 92807

## EXHIBIT "A"

## LEGAL DESCRIPTION

A.P.N. # : 358-161-16

DocMagic *eForms* 800-649-1362
www.docmagic.com

MIN: 1002729-0000005190-4

Loan Number: 6110215

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 7th day of DECEMBER 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to PACIFIC MUTUAL FUNDING, INC. DBA PACIFIC RESIDENTIAL FINANCING, A CALIFORNIA CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

6099 EAST CAMINO MANZANO, ANAHEIM, CALIFORNIA 92807

[Property Address]

*THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY PAYMENT OPTIONS FOR AN INITIAL PERIOD. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).*

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 7.250 %. The Note also provides for a change in the initial rate to an adjustable interest rate and changes to payments, as follows:

## 3.   PAYMENTS

(A) Time and Place of Payments

I will make my monthly payments on the 1st day of each month beginning on FEBRUARY 1, 2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal, if any. If, on JANUARY 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3020 SATURN STREET, SUITE 100, BREA, CALIFORNIA 92821 or at a different place if required by the Note Holder.

(B) Amount of My Monthly Payments

I will pay interest by making payments in the amount of U.S. $ 2,125.00 (the "Minimum Payment") every month until either (i) the first Interest Rate Change Date set forth in Section 4(A), or (ii) payment of the Minimum Payment on my next scheduled payment date would cause my

—42—

principal balance to exceed the Maximum Limit set forth in Section 3(D), whichever event occurs first (the "Option Period). The Minimum Payment is calculated based upon the amount of interest that will accrue each month at a rate equal to         4.250 %. Payment of the Minimum Payment amount will result in accrued but unpaid interest being added to Principal. The unpaid Principal and any accrued but unpaid interest will then accrue additional interest at the rate then in effect. This practice is known as negative amortization.

After the expiration of the Option Period, I will pay interest by making payments in an amount sufficient to pay interest as it accrues every month until   JANUARY 1, 2017          (the "Interest Only Period"). This amount will be determined by the Note Holder as set forth in Section 4(C). In addition, if I make payments of principal and/or accrued unpaid interest during the Interest Only Period, my monthly interest-only payment amount will change and will be based on the remaining Principal and my then current interest rate.

After the expiration of the Interest Only Period, I will pay principal and interest by making payments every month for the remaining term (the "Full Amortization Period"). The amount of payments during the Full Amortization Period will be determined by the Note Holder as set forth in Section 4(C).

(C) Additions to My Unpaid Principal

During the Option Period, my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

(D) Limit on My Unpaid Principal; Increased Minimum Payment

My unpaid Principal can never exceed the Maximum Limit equal to   115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to additions to my unpaid Principal described in Section 3(C). If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, then my monthly payment will be adjusted to an amount equal to the Interest Only Payment described in Section 3(E)(i). I will continue to pay that amount until the Interest Only Period expires.

(E) Additional Payment Options

During the Option Period, the Note Holder may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

(i)   **Interest Only Payment:** Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  **Fully Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments, at the then current interest rate.

(iii) **15 Year Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments, at the then current interest rate.

5 YEAR OPTION ARM RIDER - MULTISTATE -BSR 1056
MTA - LIBOR SIX MONTH INDEX  05/09/06        Page 2 of 4                    *DocMagic eForms* 800-649-1362
                                                                           www.docmagic.com

—43—

These Payment Options are only applicable if they are greater than the Minimum Payment.

**(F)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change.  The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 4.    ADJUSTABLE INTEREST RATE

**(A)  Interest Rate Change Dates**
The interest rate I will pay will change on the   1st   day of  JANUARY, 2012      , and the adjustable interest rate I will pay may change on that day every 6th month thereafter.  The date on which my interest rate changes is called an "Interest Rate Change Date."

**(B)  The Index**
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.*  The most recent index figure available as of the first business day of the month immediately preceding the month in which the Interest Rate Change Date occurs is called the "Current Index."
If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C)  Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 250/1000                      percentage point(s) (      2.250  %)
to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.
The Note Holder will then determine the amount of the monthly payment.  If the Interest Rate Change Date occurs during the Interest-Only Period, the new monthly interest-only payment will be based on the unpaid Principal that I am expected to owe at the Interest Rate Change Date and my new interest rate.  If the Interest Rate Change Date occurs during the Full Amortization Period, my new monthly payment will be in an amount sufficient to repay the unpaid Principal that I am expected to owe at the Interest Rate Change Date at my new interest rate in substantially equal payments.

**(D)  Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Interest Rate Change Date will not be greater than
12.250  % or less than      2.250  %.  Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than  ONE AND 000/1000
                      percentage point(s) (      1.000  %) from the rate of interest
I have been paying for the preceding        6        months.  My interest rate will never be greater than
12.250  %.

**(E)  Effective Date of Changes**
My new interest rate will become effective on each Interest Rate Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

---

5 YEAR OPTION ARM RIDER - MULTISTATE ·BSR 1056
MTA - LIBOR SIX MONTH INDEX  05/09/06        Page 3 of 4

*DocMagic* 800-649-1362
*www.docmagic.com*

**(F)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.


BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.


_____ (Seal)                    _____ (Seal)
SILVIANO HERNANDEZ        -Borrower                                            -Borrower


_____ (Seal)                    _____ (Seal)
                          -Borrower                                            -Borrower


_____ (Seal)                    _____ (Seal)
                          -Borrower                                            -Borrower


5 YEAR OPTION ARM RIDER - MULTISTATE -BSR 1056
MTA - LIBOR SIX MONTH INDEX  05/09/06          Page 4 of 4          DocMagic *eForms* 800-649-1362
                                                                   www.docmagic.com

_—45—_

# EXHIBIT B

MIN: 1002729-0000005190-4

Loan Number: 6110215

# ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

*THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY PAYMENT OPTIONS FOR AN INITIAL PERIOD. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).*

| DECEMBER 7, 2006 | BREA | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

6099 EAST CAMINO MANZANO, ANAHEIM, CALIFORNIA 92807
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 600,000.00     (this amount is called "Principal"), plus interest, to the order of Lender.  Lender is   PACIFIC MUTUAL FUNDING, INC. DBA PACIFIC RESIDENTIAL FINANCING, A CALIFORNIA CORPORATION (CFL # 01050206) . I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.250 %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will make my monthly payments on the  1st  day of each month beginning on  FEBRUARY 1   , 2007     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal, if any. If, on  JANUARY 1    , 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   3020 SATURN STREET, SUITE 100, BREA, CALIFORNIA 92821

or at a different place if required by the Note Holder.

### (B) Amount of My Monthly Payments

I will pay interest by making payments in the amount of U.S. $  2,125.00     (the "Minimum Payment") every month until either (i) the first Interest Rate Change Date set forth in Section 4(A), or (ii) payment of the Minimum Payment on my next scheduled payment date would cause my principal balance to exceed the Maximum Limit set forth in Section 3(D), whichever event occurs first (the "Option Period"). The Minimum Payment is calculated based upon the amount of interest that will accrue each month at a rate equal to      4.250 %.

*EXHIBIT B*
*-46-*

Payment of the Minimum Payment amount will result in accrued but unpaid interest being added to Principal. The unpaid Principal and any accrued but unpaid interest will then accrue additional interest at the rate then in effect. This practice is known as negative amortization.

After the expiration of the Option Period, I will pay interest by making payments in an amount sufficient to pay interest as it accrues every month until   JANUARY 1, 2017       (the "Interest Only Period"). This amount will be determined by the Note Holder as set forth in Section 4(C). In addition, if I make payments of principal and/or accrued unpaid interest during the Interest Only Period, my monthly interest-only payment amount will change and will be based on the remaining Principal and my then current interest rate.

After the expiration of the Interest Only Period, I will pay principal and interest by making payments every month for the remaining term (the "Full Amortization Period"). The amount of payments during the Full Amortization Period will be determined by the Note Holder as set forth in Section 4(C).

(C) Additions to My Unpaid Principal

During the Option Period, my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

(D) Limit on My Unpaid Principal; Increased Minimum Payment

My unpaid Principal can never exceed the Maximum Limit equal to   115   percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to additions to my unpaid Principal described in Section 3(C). If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, then my monthly payment will be adjusted to an amount equal to the Interest Only Payment described in Section 3(E)(i). I will continue to pay that amount until the Interest Only Period expires.

(E) Additional Payment Options

During the Option Period, the Note Holder may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

(i)   Interest Only Payment:  Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  Fully Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments, at the then current interest rate.

(iii) 15 Year Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments, at the then current interest rate.

These Payment Options are only applicable if they are greater than the Minimum Payment.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 4.   ADJUSTABLE INTEREST RATE

(A) Interest Rate Change Dates

The interest rate I will pay will change on the   1st   day of   JANUARY, 2012        , and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

5 YEAR OPTION ARM NOTE - MULTISTATE - BSR 4008
MTA - LIBOR SIX MONTH INDEX  05/09/06            Page 2 of 6            DocMagic *eFormss* 800-649-1362
                                                                                            www.docmagic.com

-47-

**(B) The Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent index figure available as of the first business day of the month immediately preceding the month in which the Interest Rate Change Date occurs is called the "Current Index."

If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                              percentage point(s) (        2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

The Note Holder will then determine the amount of the monthly payment. If the Interest Rate Change Date occurs during the Interest-Only Period, the new monthly interest-only payment will be based on the unpaid Principal that I am expected to owe at the Interest Rate Change Date and my new interest rate. If the Interest Rate Change Date occurs during the Full Amortization Period, my new monthly payment will be in an amount sufficient to repay the unpaid Principal that I am expected to owe at the Interest Rate Change Date at my new interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Rate Change Date will not be greater than      12.250 % or less than        2.250   %. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than   ONE AND 000/1000
                              percentage point(s) (        1.000   %) from the rate of interest I have been paying for the preceding        6         months. My interest rate will never be greater than      12.250 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.     BORROWER'S RIGHT TO PREPAY     ** See attached Prepayment Note Addendum.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

5 YEAR OPTION ARM NOTE - MULTISTATE - BSR 4008
MTA - LIBOR SIX MONTH INDEX  05/09/06                    Page 3 of 6                    DocMagic *eForms* 800-649-1362
                                                                                www.docmagic.com

-48-

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

---

5 YEAR OPTION ARM NOTE - MULTISTATE - BSR 4008
MTA - LIBOR SIX MONTH INDEX   05/09/06                    Page 4 of 6                 *DocMagic eForms* 800-649-1362
                                                                                            www.docmagic.com

- 49 -

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

-50-

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
SILVIANO HERNANDEZ          -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

*[Sign Original Only]*

Loan Number: 6110215

# PREPAYMENT NOTE ADDENDUM
## (Multi-State)

This Prepayment Note Addendum is made this 7th   day of DECEMBER, 2006              and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to PACIFIC MUTUAL FUNDING, INC. DBA PACIFIC RESIDENTIAL FINANCING, A CALIFORNIA CORPORATION (the "Lender") which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at 6099 EAST CAMINO MANZANO, ANAHEIM, CALIFORNIA 92807 (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note, any addenda to the Note or the Security Instrument, Borrower and Lender covenant, and agree, that the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" or "BORROWER'S PAYMENTS BEFORE THEY ARE DUE" are amended to read as follows:

Subject to the prepayment penalty provided below, I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid principal due under this Note. A payment of only part of the unpaid principal is known as a "partial prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

If within the THIRTY-SIX  ( 36    ) month period beginning with the date I execute this Note (the "Penalty Period"), I make a full prepayment or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, I will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of (a) the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of this Note, calculated at the rate of interest in effect under the terms of this Note at the time of the prepayment; or (b) the maximum allowable prepayment penalty permitted by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first twelve (12) months of the term of this Note, no prepayment charge will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of this Note. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If this Note is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase. If this Note is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

MULTISTATE PREPAYMENT NOTE ADDENDUM - FIRST TWELVE MONTH HARD
09/05/06                                                          Page 1 of 2                        *DocMagic* eForms 800-649-1362
                                                                                                       www.docmagic.com

— 52 —

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge. Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

**NOTE TO BORROWER**

Do not sign this Addendum before you read it. This Addendum provides for the payment of a prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of this Addendum.

_____ (Seal)          _____ (Seal)
SILVIANO HERNANDEZ          -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                    -Borrower

_ 5 3 _

Loan Number: 6110215

# PREPAYMENT RIDER
## (Multi-State)

MIN 1002729-0000005190-4

This Prepayment Rider is made this 7th    day of DECEMBER, 2006                and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note (the "Debt Instrument") to PACIFIC MUTUAL FUNDING, INC. DBA
PACIFIC RESIDENTIAL FINANCING, A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located
at  6099 EAST CAMINO MANZANO, ANAHEIM, CALIFORNIA 92807

(the "Property").

Additional Covenants. Notwithstanding anything to the contrary set forth in the Debt Instrument,
any addenda to the Debt Instrument or the Security Instrument, Borrower and Lender covenant, and agree
as follows:

Subject to the prepayment penalty provided below, I have the right to make
payments of principal at any time before they are due. A payment of principal only is
known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid
principal due under the Debt Instrument. A payment of only part of the unpaid principal
is known as a "partial prepayment". When I make a prepayment, I will tell the Note
Holder in writing that I am doing so. I may not designate a payment as a prepayment if
I have not made all the monthly payment due under the Debt Instrument.

If, within the THIRTY-SIX ( 36    ) month period beginning with the
date I execute the Debt Instrument (the "Penalty Period"), I make a full prepayment, or
partial prepayment in any twelve (12)-month period that exceeds 20% of the original
principal loan amount, I will pay a prepayment charge as consideration for the Note
Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of
(a) the amount of interest that would accrue during a six (6)-month period on the amount
prepaid that exceeds 20% of the original principal balance of the Debt Instrument,
calculated at the rate of interest in effect under the terms of the Debt Instrument at the time
of the prepayment; or (b) the maximum allowable prepayment penalty permitted by
applicable law or regulation. No prepayment charge will be assessed for any prepayment
occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with
a bona fide sale of the Property to an unrelated third party after the first twelve (12)
months of the term of the Debt Instrument, no prepayment charge will be assessed. In that
event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of
such sale.

The Note Holder will apply all prepayments to reduce the amount of principal that
I owe under the Debt Instrument. However, the Note Holder may apply my prepayment

---

MULTISTATE PREPAYMENT RIDER - FIRST 12 MONTH HARD
09/05/06                                   Page 1 of 2

DocMagic *eFerms* 800-649-1362
www.docmagic.com

to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of the Debt Instrument. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If the Debt Instrument is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.   If the Debt Instrument is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge.  Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Security Instrument are unchanged and remain in full force and effect.

BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of the Rider.

_____ (Seal)                    _____ (Seal)
SILVIANO HERNANDEZ        -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                          -Borrower

- 55 -

# EXHIBIT C

Recording Requested By
When Recorded Mail To

Cal-Western Reconveyance Corp.
P.O. Box 22004
525 East Main Street
El Cajon CA 92022-9004

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

9.00

2008000303029 04:22pm 06/24/08
105 59 N15 2
0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

Trustee Sale No. 1153187-02

Loan No. XXXXXX3149 Ref: HERNANDEZ, SILVIANO

**Space Above This Line For Recorder's Use**

# NOTICE OF DEFAULT

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice). This amount is $11,029.77 as of June 23, 2008, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC

C/O EMC MORTGAGE CORPORATION
800 STATE HIGHWAY 121 BYPASS
LEWISVILLE TX 75067-4180

(877)362-6631

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

Page 1 of 2

*EXHIBIT C*
*— 56 —*